SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

### State v. Celestine Payne (A-25-23) (088925)

**Argued September 10, 2024 -- Decided January 13, 2025**

**WAINER APTER, J., writing for a unanimous Court.**

In this appeal, the Court considers whether the trial court abused its discretion in denying Celestine Payne's petition for release under the Compassionate Release Act (CRA or Act), N.J.S.A. 30:4-123.51e.

In 1991, Celestine Payne poisoned her husband, Alphonso, to collect his life insurance policy. She then enlisted her children and a tenant who lived with her family, Eugene Cooper, to help her dump Alphonso's body on the side of a road.

Two years later, Celestine convinced Cooper to name her the beneficiary of a life insurance policy in his name. Once the policy was in place, she offered Charles Pinchom, the boyfriend of Celestine's daughter, Wendy, $60,000 to kill Cooper. When Pinchom refused, Celestine told him that Cooper was molesting Wendy. In September 1994, she handed Pinchom a kitchen knife and told him to take Cooper "somewhere dark and stab him in the neck." Pinchom stabbed Cooper and left him on the street to die. But Cooper survived. While Cooper was in the hospital in critical condition, Celestine went to the hospital, pretended to be his mother, and signed a do-not-resuscitate order (DNR).

Celestine next enlisted her daughter Wendy to pose as Wendy's best friend, 18-year-old Tara Carter, to obtain a life insurance policy on Tara naming Celestine as the beneficiary. Tara had grown up with the Payne family and moved in with them after Tara's family moved to Georgia. With the fraudulent life insurance policy in hand, Celestine repeatedly pressured Pinchom to kill Tara. He initially refused. Then Tara learned from Wendy that Celestine had poisoned Alphonso, and Celestine had also offered Tara money to act as her alibi in an arson. Uncomfortable, Tara made plans to move out. The day before Tara was supposed to move, Celestine handed Pinchom a crowbar, and said "now is your chance." Pinchom then struck Tara in the back of the head four or five times, bludgeoning her to death. Together, Celestine and Pinchom stuffed Tara's body into a sleeping bag and dumped her in Paterson's Eastside Park. After joggers discovered Tara's body, Celestine and her children lied to police to cover up the crimes.

1

In 1997, Celestine pled guilty and was sentenced to two concurrent life terms with 30 years' parole ineligibility plus a consecutive 20-year term. The sentencing court found several aggravating factors, including that the offenses were "committed in an especially heinous, cruel, or depraved manner," N.J.S.A. 2C:44-1(a)(1).

In November 2021, when she was 71 years old, Celestine petitioned for compassionate release. The trial court found she had satisfied the Act's medical and public safety requirements, and it acknowledged that Celestine "had no infractions" while incarcerated, was "compliant with prison rules," and got along "well with other inmates," along with additional mitigating factors. But the court denied her petition, finding, among other things, that her crimes involved "particularly heinous, cruel, or depraved conduct" and therefore satisfied the first "extraordinary aggravating factor" set forth in State v. A.M., 252 N.J. 432, 460 (2023). The Appellate Division reversed, holding, as relevant here, that the facts presented in this case "are often present in first-degree murder cases" and did not "rise to the level of extraordinary." The Court granted certification. 256 N.J. 440 (2024).

**HELD:** The trial court's finding that Celestine's crimes were extraordinarily heinous, cruel, and depraved was supported by substantial evidence in the record, and the trial court's application of extraordinary aggravating factor one was not an abuse of discretion. In addition, in denying Celestine's petition for compassionate release, the trial court appropriately considered significant mitigating factors raised by Celestine alongside the extraordinary aggravating factors raised by the State.

1. The CRA was enacted in 2020 to reduce capacity and alleviate financial strains on the Department of Corrections while getting medically vulnerable residents the care they need outside of prison. The Act provides that for an inmate who has a permanent physical incapacity, "the court may order" compassionate release if it "finds by clear and convincing evidence that the inmate is . . . permanently physically incapable of committing a crime if released and . . . the conditions . . . under which the inmate would be released would not pose a threat to public safety." N.J.S.A. 30:4-123.51e(f)(1). In A.M., the Court held that the CRA "cannot be read to require courts to grant compassionate release" if the medical and public safety conditions are met, 252 N.J. at 454-56 (emphasis added), but stressed that "courts may not exercise discretion in a way that creates de facto categorical barriers to release and overrides legislative intent," id. at 459. Instead, inmates who meet "the Act's medical and public safety criteria should be granted compassionate release unless one or more extraordinary aggravating factors exist," such as "whether an offense involved any of the following extraordinary circumstances: (1) particularly heinous, cruel, or depraved conduct; (2) a particularly vulnerable victim . . . ; (3) an attack on the institutions of government or the administration of justice; and (4) whether release would have a particularly detrimental effect on the well-being and recovery process of victims and family members." Id. at 460. (pp. 16-18)

2

2.  The trial court's finding that Celestine's crimes were "particularly heinous, cruel, or depraved," see A.M., 252 N.J. at 460, is amply supported by the record.  The Court does not accept the Attorney General's suggestion that a finding that aggravating factor one applies at sentencing will generally preclude compassionate release.  However, the Court does consider some case law interpreting that factor to be instructive.  Here, the trial court's analysis of extraordinary aggravating factor one reflected no impermissible double-counting of the elements of first-degree murder, see State v. Fuentes, 217 N.J. 57, 74-75 (2014), and did not rely on facts common to many first-degree murder cases, see State v. McGuire, 419 N.J. Super. 88, 159-60 (App. Div. 2011).  As required in A.M., the trial court found the facts of this case truly "exceptional and rare."  252 N.J. at 461.  (pp. 18-23)

3.  The mitigating factors that courts consider at sentencing may not be relevant at a compassionate release hearing held years later.  But other mitigating evidence may weigh strongly in favor of compassionate release, such as a petitioner's conduct in prison, including lack of disciplinary infractions and involvement in work, courses, or other activities; testimony from those who know the person well about their extraordinary adjustment to prison life or an extraordinary personal transformation; strong family or community support; and more.  The trial court considered just such evidence here, yet it still denied compassionate release, implicitly finding none of that could overcome Celestine's extraordinarily cruel, heinous, and depraved conduct.  The Court discerns no abuse of discretion in that conclusion.  In petitioning a court for compassionate release, the inmate bears the burden of proving she meets the Act's medical and public safety requirements.  If the State relies on one or more extraordinary aggravating factors to then oppose compassionate release, petitioners can present significant mitigating factors that point in favor of release, which the trial court must consider.  The existence of mitigating factors alone, however, cannot establish that an individual is entitled to compassionate release. (pp. 23-25)

> **REVERSED.**

**CHIEF JUSTICE RABNER and JUSTICES PATTERSON, PIERRE-LOUIS, FASCIALE, and NORIEGA join in JUSTICE WAINER APTER's opinion.**

SUPREME COURT OF NEW JERSEY
A-25 September Term 2023
088925

State of New Jersey,

Plaintiff-Appellant,

v.

Celestine Payne,

Defendant-Respondent.

On certification to the Superior Court,
Appellate Division.

Argued
September 10, 2024

Decided
January 13, 2025

Timothy P. Kerrigan, Jr., Chief Assistant Prosecutor,
argued the cause for appellant (Camelia M. Valdes,
Passaic County Prosecutor, attorney; Timothy P.
Kerrigan, Jr., of counsel and on the briefs).

Colin Sheehan, Assistant Deputy Public Defender, argued
the cause for respondent (Jennifer N. Sellitti, Public
Defender, attorney; Colin Sheehan, of counsel and on the
briefs, and Alison Gifford, Assistant Deputy Public
Defender, on the briefs).

David M. Galemba, Deputy Attorney General, argued the
cause for amicus curiae Attorney General of New Jersey
(Matthew J. Platkin, Attorney General, attorney; David
M. Galemba, of counsel and on the brief).

1

Kevin R. Li argued the cause for amicus curiae
Association of Criminal Defense Lawyers of New Jersey
(Pashman Stein Walder Hayden, attorneys; Kevin R. Li
and Claude Heffron, on the brief).

Alexander Shalom argued the cause for amicus curiae
American Civil Liberties Union of New Jersey
(Lowenstein Sandler, and American Civil Liberties Union
of New Jersey Foundation, attorneys; Alexander Shalom
and Jeanne LoCicero, on the brief).

JUSTICE WAINER APTER delivered the opinion of the Court.

In 1991, Celestine Payne poisoned her husband Alphonso Payne to collect his $39,000 life insurance policy. She then enlisted her children and a tenant who lived with her family, Eugene Cooper, to help her dump Alphonso's body on the side of a road.

Two years later, Celestine convinced Cooper to name her the beneficiary of a life insurance policy in his name. Then, she had him stabbed with her kitchen knife. When Cooper did not die, Celestine went to the hospital, pretended to be his mother, and signed a do-not-resuscitate order (DNR).

Celestine next enlisted her daughter Wendy Payne to pose as Wendy's best friend, 18-year-old Tara Carter, to obtain a life insurance policy on Tara naming Celestine as the beneficiary. In 1995, she solicited Wendy's boyfriend, Charles Pinchom, to bludgeon Tara to death. She and Pinchom stuffed Tara's body into a sleeping bag and dumped her in a park.

2

After serving 26 years in prison for murder and other crimes, Celestine petitioned for release under the Compassionate Release Act (CRA or Act), N.J.S.A. 30:4-123.51e. The trial court found she had satisfied the Act's medical and public safety requirements. But the court denied her petition, finding, among other things, that her crimes involved "particularly heinous, cruel, or depraved conduct" and therefore satisfied the first "extraordinary aggravating factor" set forth in State v. A.M., 252 N.J. 432, 460 (2023).

The Appellate Division reversed, concluding that the trial court had abused its discretion in finding that Celestine's crimes were extraordinarily heinous, cruel, or depraved.

We disagree. The trial court's finding that Celestine's crimes were extraordinarily heinous, cruel, and depraved was supported by substantial evidence in the record, and the trial court's application of extraordinary aggravating factor one was not an abuse of discretion. In addition, in denying Celestine's petition for compassionate release, the trial court appropriately considered significant mitigating factors raised by Celestine alongside the extraordinary aggravating factors raised by the State.

We therefore reverse the Appellate Division's judgment. We do not reach the other extraordinary aggravating factors relied on by the trial court or

3

discussed by the parties. We similarly do not reach the State's alternative argument that Celestine did not satisfy the CRA's public safety requirements.

## I.

## A.

In 1997, Celestine[1] pled guilty to two counts of first-degree murder, two counts of conspiracy to commit murder, one count of first-degree attempted murder, three counts of hindering apprehension, two counts of forgery, and

---

[1]    The CRA states that "information contained in the petition [for compassionate release] and the contents of any comments submitted by a recipient in response . . . shall be confidential and shall not be disclosed to any person who is not authorized to receive or review the information or comments." N.J.S.A. 30:4-123.51e(e)(4). As we noted in A.M., the CRA "does not expressly address testimony in open court at a hearing on a petition." 252 N.J. at 447. Nor does it address judicial opinions. In A.M., we held that if a CRA opinion describes a defendant's medical condition, "it cannot identify the defendant by name." Ibid.; see also State v. F.E.D., 251 N.J. 505, 536 (2022). We therefore identified one petitioner by name, without discussing his specific medical condition, and identified the second petitioner by initials. A.M., 252 N.J. at 448.

Here, Celestine repeatedly waived CRA confidentiality before the trial court. The court nonetheless used initials for Celestine and all her relatives because of the "abundance of medical details" in the opinion. The Appellate Division adopted the same practice. In this opinion, we do not include information about Celestine's medical conditions. We therefore use first names for Celestine and all members of the Payne family. We also use first names for Tara Carter and her sister, Rosie Carter. We mean no disrespect in doing so. For those who do not share the last name Payne or Carter, we use last names. We continue to call on the Legislature to review the CRA's confidentiality provision and provide instruction on how courts should handle use of CRA petitioners' names, including in judicial opinions. See ibid.

4

other crimes.  She was sentenced to two concurrent life terms with 30 years' parole ineligibility plus a consecutive 20-year term.  The following facts are taken from the presentence report and testimony at the CRA hearing.

In the late 1980s, Celestine wanted "to get rid of her husband."  She unsuccessfully tried to procure a gun to shoot him.  She also solicited Cooper to shoot him, but Cooper refused.

In 1991, Celestine poisoned her husband in order to collect his $39,000 life insurance policy.  She had Cooper and her children, then ages 14 to 20, help her put her husband's body in a large box and dump him on the side of the road.

Celestine next convinced Cooper to take out a life insurance policy naming her as the beneficiary.  Once the policy was in place, she offered Pinchom $60,000 to kill Cooper.  When Pinchom, who had recently been released from prison, refused, Celestine told him that Cooper was molesting Wendy.  In September 1994, she handed Pinchom a kitchen knife and told him to take Cooper "somewhere dark and stab him in the neck."

Pinchom stabbed Cooper and left him on the street to die.  But Cooper survived.  While Cooper was in the hospital in critical condition, Celestine went to the hospital, pretended to be his mother, and signed a DNR.

Two months later, Celestine instructed Wendy to impersonate her best friend Tara and take out a $25,000 life insurance policy on Tara, again naming Celestine as the beneficiary. Tara had grown up with the Payne family. The two families vacationed together, the children went to school together, and Tara respected and loved Celestine like a mother. After Tara's family moved to Georgia, Tara decided that she wanted to move back to New Jersey. She and her family arranged that she would move in with Celestine and Wendy.

With the fraudulent life insurance policy in hand, Celestine repeatedly pressured Pinchom to kill Tara, offering him a portion of the proceeds. He initially refused.

Then Tara learned from Wendy that Celestine had poisoned Alphonso. Celestine had also offered Tara $10,000 to act as her alibi in an arson -- Celestine planned to collect $538,000 in insurance money by having Pinchom blow up her house. Tara told her sister Rosie Carter that she felt uncomfortable living with Celestine. Tara and Rosie made plans for Tara to move out of the house.

On March 3, 1995, the day before Tara was supposed to move out, Celestine called Pinchom. While Tara sat at the kitchen table, Celestine handed Pinchom a crowbar, and said "now is your chance." Pinchom then struck Tara in the back of the head four or five times, bludgeoning her to

6

death.  Together, Celestine and Pinchom stuffed Tara's body into a sleeping bag and dumped her in Paterson's Eastside Park.  After joggers discovered Tara's body, Celestine and her children lied to police to cover up the crimes.

At Celestine's sentencing, the court found several aggravating factors, including factor one:  that Celestine's offenses were "committed in an especially heinous, cruel, or depraved manner," N.J.S.A. 2C:44-1(a)(1).

B.

In November 2021, when she was 71 years old, Celestine petitioned the court for compassionate release.

Celestine attached a Certificate of Eligibility, certifying that she suffered from a permanent physical incapacity under N.J.S.A. 30:4-123.51e(d)(2) and was therefore "medically eligible for consideration for Compassionate Release."  The parties do not dispute that Celestine suffers from a permanent physical incapacity under the CRA.  We therefore do not discuss her serious medical conditions, or her permanent physical incapacity, in this opinion.

The court convened a CRA hearing and heard multiple days of testimony from doctors, representatives of Celestine's family, representatives of Tara's family, and Celestine herself.

Dr. Sandra Braimbridge, the medical director at Edna Mahan Correctional Facility, where Celestine is incarcerated, testified about

7

Celestine's medical conditions and explained that she had been living in the infirmary since 2021. Dr. Braimbridge testified that she knew Celestine "very well" and found her to be a "respectful" and "delightful human being."

Dr. James Cassidy, the clinician supervisor of mental health at Edna Mahan, testified that Celestine was "psychologically stable" and at a "very low risk" to commit any crime. He stated that Celestine's behavior at Edna Mahan was "exemplary," and she was "loved by her peers" in the prison.

Celestine testified that she had taken every course offered at Edna Mahan. She explained that she had zero infractions while incarcerated and had been active in church and employed in the commissary and in the sewing program until she was no longer physically able. Celestine apologized repeatedly for her crimes.

Two of Celestine's children and two of her grandchildren testified that they loved Celestine, communicated with her frequently, and would visit and support her if she were released.

For the State, Rosie testified that Celestine manipulated the Carter family to gain their trust by feigning care for Tara, who was "18 and vulnerable." Tara's daughter, Banisha Curry,[2] who was two years old when her mother was murdered, testified that she lived "a life of . . . grief and . . .

---

[2] The record includes several different spellings of Ms. Curry's name.

pain," and had difficulty trusting people because of how Celestine manipulated Tara's trust. Curry feared Celestine "would mastermind . . . another plot against someone else in the family." Curry further stated that Celestine's apology at the CRA hearing was the first made to her or any member of Tara's family.

C.

In its decision, the trial court detailed the above evidence. It found all witnesses, other than Celestine, "credible and sincere." The court discussed our opinions in State v. A.M. and State v. F.E.D., 251 N.J. 505 (2022), at length. It then denied Celestine's petition for compassionate release.

As an initial matter, the court found that Celestine met the medical and public safety conditions set forth in the Act. The court also acknowledged that Celestine "had no infractions" while incarcerated, was "compliant with prison rules" and got along "well with other inmates." It noted Celestine's work history in prison and the courses Celestine completed, "including relating to healing one's self, understanding domestic violence, managing anger, victim focus," and more. The court recognized that Celestine "expressed remorse for all of her crimes" and "insist[ed] that she profoundly regretted what she had done." It acknowledged that Celestine would be eligible for parole in March 2025. And the court documented Celestine's plan to live with her daughter, "a

9

skilled and experienced nurse," who the court was "satisfied . . . would take good and loving care" of Celestine.

Yet the court denied Celestine's petition for compassionate release, relying on our holding in A.M., 252 N.J. at 460, that a CRA petition may be denied if "one or more extraordinary aggravating factors exist." The court stressed the "heinous cruelty" of Celestine's crimes (factor one), "the vulnerability of each victim" (factor two), and the intense harm that release would cause Rosie and Curry (factor four).

As to extraordinary aggravating factor one, the court found Celestine's crimes to be "extraordinarily cruel and vicious." The court noted how Tara, who was "living on her own and vulnerable," was "viciously beaten to death with a crowbar," and that "[t]his terrible and horrendously evil crime was motivated by the hope of financial gain." The court similarly recounted that Cooper, who was "autistic and vulnerable," was repeatedly stabbed and left for dead. When he did not die, Celestine "went to the hospital, claimed that she was his mother, and instructed the doctors to implement a [DNR]. This was vicious, cold-hearted and cruel . . . ." The court concluded that Celestine's "horrible crimes were committed over a substantial period of time, between September 1991 and March 1995" and involved "significant planning."

10

As to extraordinary aggravating factors two and four, the court emphasized the vulnerability of both Tara and Cooper, and how Rosie and Curry would be profoundly and grievously harmed if Celestine were released.

D.

Celestine appealed. The Appellate Division reversed and remanded, concluding that the trial court "engaged in an inappropriate exercise of judicial discretion when it denied [Celestine] compassionate release."

As to extraordinary aggravating factor one, the Appellate Division concluded that "the facts found by the trial court undoubtedly establish a basis for a finding of aggravating factor one" at sentencing. However, the appellate court explained, to justify denying compassionate release, the aggravating factors must "rise to the level of extraordinary." In the court's view, "[t]he tragic facts presented here -- premeditation, blunt force trauma, and monetary gain -- are often present in first-degree murder cases." According to the Appellate Division, "characterizing the trial court's findings on [factor one] as extraordinary would create 'de facto categorical barriers to release,'" contrary to this Court's decision in A.M., 252 N.J. at 459.

The Appellate Division also disagreed with the trial court's application of extraordinary aggravating factor four. It did not discuss extraordinary

11

aggravating factor two. The Appellate Division instructed the trial court to grant Celestine's petition for compassionate release.

E.

We granted the State's motion to stay Celestine's release and its petition for certification. 256 N.J. 440 (2024). We also granted leave to appear as amici curiae to the Attorney General of New Jersey (Attorney General), the American Civil Liberties Union of New Jersey (ACLU), and the Association of Criminal Defense Lawyers of New Jersey (ACDL).

II.

A.

The State argues that "the Appellate Division failed to apply the abuse of discretion standard and instead substituted its own judgment, based on review of a cold record, for that of the trial court." The State contends that under the correct standard of review, it "cannot be said that the trial court's determination that defendant engaged in particularly heinous, cruel, or depraved conduct rested on an impermissible basis, was made without a rational explanation, or inexplicably departed from established principles." The State emphasizes the trial court's "detailed factual findings regarding defendant's conduct," including that: "defendant's three (3) homicidal acts were committed over a period of several years" and "involved significant

12

planning"; the crimes against Cooper and Tara were "particularly vicious"; Celestine "dumped" two bodies; and Celestine "pretended to be [Cooper's] mother in an attempt to fraudulently convince doctors that it was his family's wish that he not be resuscitated."

The Attorney General agrees that the Appellate Division "substituted its judgment for that of the trial court." The Attorney General likewise details why this is "not just another murder case": Celestine "committed two successful murders and attempted a third, executed a multi-year plan where she solicited others -- including her own children -- to help murder those closest to her in a protracted insurance-fraud scheme, and employed particularly brutal methods of killing and exhibited grave disrespect to the remains." The Appellate Division wrongly minimized those facts, the Attorney General maintains, reducing Celestine's "breathtaking[ly] cruel[] and brutal[]" crimes to "premeditation, blunt force trauma, and monetary gain."

B.

Celestine contends that the Appellate Division correctly reversed the trial court's determination. According to Celestine, A.M. "made clear that extraordinary aggravating factors should permit denial only in an extremely limited subset of cases." In other words, "extraordinary must mean extraordinary," and, as the Court held in A.M., a finding of extraordinary

13

aggravating factors must be "exceptional and rare" (quoting 252 N.J. at 461). Regarding the first extraordinary aggravating factor, Celestine maintains that a defendant's conduct must be "uniquely heinous" to justify denial of compassionate release.

Celestine also submits that because "[o]ur courts have <u>never</u> considered aggravating factors without also considering mitigating factors," courts must "consider not only whether extraordinary aggravating factors warrant denial but also whether mitigating factors warrant granting release." Celestine avers that had the trial court properly considered the "abundance of mitigating factors" she presented, it would have granted her release.

The ACLU agrees with Celestine that "except in rare and exceptional cases, to effectuate the will of the Legislature, courts should grant compassionate release to people who satisfy the medical and public safety requirements of the Act." The ACLU likewise agrees that "[a]ny analysis of aggravating factors must necessarily also include evaluation of mitigating factors." Such mitigating factors might include whether "the petitioner is otherwise parole eligible, has completed unusual programming, or demonstrated a noteworthy personal transformation." The ACDL highlights the financial burden on the Department of Corrections (DOC) in providing

14

"around-the-clock medical care to a person who has proven she does not pose a threat to the public safety."

### III.

### A.

We review a trial court's decision to grant or deny compassionate release for abuse of discretion. A.M., 252 N.J. at 442. Although we did not specify in A.M. the standard of review for application of an extraordinary aggravating factor, we now hold that such findings are also reviewed for abuse of discretion. That keeps with both the standard applied to determinations regarding the CRA's statutory factors, see ibid., and the standard applied to a trial court's finding of aggravating or mitigating factors at sentencing, see State v. Miller, 237 N.J. 15, 19 (2019).

In determining whether a trial court abused its discretion in applying a particular extraordinary aggravating factor, we thus will consider whether the application of the factor was "based upon competent credible evidence in the record," and whether the trial court "clearly erred by reaching a conclusion that could not have reasonably been made." State v. Roth, 95 N.J. 334, 364, 366 (1984).

15

B.

This is our third time reviewing the Compassionate Release Act, which was enacted in 2020. As we thoroughly detailed in State v. F.E.D., the Act repealed the former Medical Parole Statute in order to "reduce capacity[] and alleviate financial strains [on the DOC] while getting medically vulnerable residents the care they need outside of prison." 251 N.J. at 522 (quoting Off. of the Governor, Press Release: Governor Murphy Signs Sentencing Reform Legislation (Oct. 19, 2020)).

The CRA does so in part by vesting authority to grant compassionate release in the courts, rather than the New Jersey State Parole Board, and by removing a provision from the former statute that had prohibited individuals convicted of murder and other serious crimes from applying for release. See N.J.S.A. 30:4-123.51e(e); N.J.S.A. 30:4-123.51c(a)(3) (repealed 2020); F.E.D., 251 N.J. at 521, 523 n.6.

To petition a court for compassionate release, an inmate must first obtain a Certificate of Eligibility based on a medical diagnosis, made by two licensed physicians, that she has a terminal condition or a permanent physical incapacity. N.J.S.A. 30:4-123.51e(b), (d)(2). The Act provides that for an inmate who has a permanent physical incapacity, "the court may order" compassionate release "if the court finds by clear and convincing evidence that

16

the inmate is . . . permanently physically incapable of committing a crime if released and . . . the conditions established . . . under which the inmate would be released would not pose a threat to public safety." Id. at (f)(1). Victims and their family members must be notified if a petition for compassionate release is filed. Id. at (e)(2). They are also entitled to testify at a hearing "concerning any harm suffered by the victim or family member." Ibid.

In State v. A.M., we considered whether a trial court has "discretion to deny compassionate release if an inmate satisfies the Act's medical and public safety conditions." 252 N.J. at 451. Relying in part on the use of the word "may" rather than "shall" in N.J.S.A. 30:4-123.51e(a) and (f)(1), and in part on the requirement in subsection (e)(2) that judges "hear a victim's testimony about any harm they have suffered," we held that the CRA "cannot be read to require courts to grant compassionate release" if the medical and public safety conditions are met. Id. at 454-56.

We then turned to how trial courts should exercise their discretion. We held that "courts may not exercise discretion in a way that creates de facto categorical barriers to release and overrides legislative intent." Id. at 459. Instead, inmates who meet "the Act's medical and public safety criteria should be granted compassionate release unless one or more extraordinary aggravating factors exist." Id. at 460. We gave several examples of what trial

17

courts "may consider" as extraordinary aggravating factors, including

"whether an offense involved any of the following extraordinary

circumstances:"

> (1) particularly heinous, cruel, or depraved conduct; (2) a particularly vulnerable victim, based on the person's advanced age, youth, or disability; (3) an attack on the institutions of government or the administration of justice; and (4) whether release would have a particularly detrimental effect on the well-being and recovery process of victims and family members.
>
> [Ibid.]

We noted that those extraordinary aggravating factors were "draw[n]

from the goals of the CRA" and from sentencing provisions in the Criminal

Code. Id. at 460 & n.6 (citing N.J.S.A. 2C:44-1(a)(1) to (2)). We concluded

that the standard to find an extraordinary aggravating factor was "a necessarily

high one" and was "limited to exceptional and rare circumstances to comport

with the statute's goal of increasing the use of compassionate release." Id. at

460-61.

IV.

A.

We hold that the trial court did not abuse its discretion in finding that

Celestine's conduct was exceptionally heinous, cruel, or depraved and in

therefore denying compassionate release.

18

The Appellate Division minimized Celestine's conduct, dismissing it as "premeditation, blunt force trauma, and monetary gain," and held that all three "are often present in first-degree murder cases." At oral argument, counsel for Celestine similarly characterized these facts as "ordinary" in cases of first-degree murder.

We disagree. The trial court's finding that Celestine's crimes were "particularly heinous, cruel, or depraved," A.M., 252 N.J. at 460, is amply supported by the record. Indeed, Celestine's overall course of criminal conduct between 1991 and 1995 was breathtakingly heinous, cruel, and depraved. It was also calculated, devious, and brutal.

As the trial court recounted in detail, Celestine first murdered her husband by poisoning him, and then enlisted her children and Cooper, her autistic tenant, to dump his body on the side of the road to make his death appear accidental. She then collected his life insurance proceeds.

Two years later, Celestine convinced Cooper to take out a life insurance policy listing her as the beneficiary. When Pinchom initially refused to kill Cooper, Celestine manipulated him by claiming that Cooper was molesting Wendy. She then handed Pinchom her kitchen knife and told him to take Cooper "somewhere dark and stab him in the neck." While Cooper was hospitalized, Celestine pretended to be his mother and signed a DNR.

19

Next, Celestine directed Wendy to impersonate Tara to take out yet another fraudulent life insurance policy naming Celestine as the beneficiary. Celestine then handed Pinchom a crowbar and directed him to bludgeon Tara to death. She and Pinchom dumped Tara's body in a park.

The trial court concluded that all those crimes, committed over a "substantial period of time between" 1991 and 1995, were "extraordinarily cruel and vicious," "horrendously evil," "cold-hearted and cruel," "motivated by the hope of financial gain," and involved "significant planning." That conclusion was not an abuse of discretion.

In reaching this holding, we do not accept the Attorney General's suggestion, made at oral argument, that a finding that aggravating factor one applies at sentencing will generally preclude compassionate release. At sentencing, the first aggravating circumstance asks courts to consider "[t]he nature and circumstances of the offense, and the role of the actor in committing the offense, including whether or not it was committed in an especially heinous, cruel, or depraved manner." N.J.S.A. 2C:44-1(a)(1). The extraordinary aggravating factor for purposes of compassionate release requires the court to determine whether the offense involved "particularly heinous, cruel, or depraved conduct." A.M., 252 N.J. at 460.

The language is similar, but not the same.  And we specifically held in A.M. that a finding of any extraordinary aggravating factor is "limited to exceptional and rare circumstances," and the burden on the State is "a necessarily high one."  Id. at 460-61.  We also held that courts may not create "de facto categorical barriers" to compassionate release.  Id. at 459.  Any rule that a particular finding at sentencing will automatically prevent compassionate release could be such a categorical bar that would "override[] legislative intent."  Ibid.

However, we do consider some case law interpreting aggravating factor one at sentencing to be instructive.  In the sentencing context, we have held that "an application of aggravating factor one must be premised upon factors independent of the elements of the crime and firmly grounded in the record."  State v. Fuentes, 217 N.J. 57, 63 (2014).  In other words, "a sentencing court must scrupulously avoid 'double-counting' facts that establish the elements of the relevant offense."  Id. at 74-75.

In State v. McGuire, the defendant shot and killed her husband; cut his body into sections and placed each section into a garbage bag and then a luggage set; drove to Virginia; threw the suitcases over the Chesapeake Bay Bridge-Tunnel and into the water; and immediately "embarked on a plan to conceal [her] crimes."  419 N.J. Super. 88, 107-08 (App. Div. 2011).  The

21

sentencing court applied aggravating factor one, finding defendant's actions "over a three-week period spanning four different states . . . reflected a willfulness and a malice that goes far beyond the elements of the crime of murder in our law." Id. at 159. The Appellate Division concluded that the trial court did not abuse its discretion, noting "that the crimes were the result of a cold, calculated plan carried out with shocking attention to detail and callous disregard for the life of a human being." Id. at 159-60.

We hold similarly in this appeal. The trial court's analysis of extraordinary aggravating factor one in this case reflected no impermissible double-counting of the elements of first-degree murder. And it did not rely on facts common to many first-degree murder cases.

Instead, as we required in A.M., the trial court found the facts of this case truly "exceptional and rare." 252 N.J. at 461. We agree. Celestine killed by preying on the trust of those closest to her -- including her victims, her family members, and others she ensnared. She manipulated people to commit fraud and to brutally kill and injure on her behalf. She dumped two bodies. When one of her victims did not die, she impersonated his mother to try to ensure he did. She did all of this through elaborate scheming, involving significant preparation, over a period of many years. Taken together, the trial

22

court did not abuse its discretion in finding that these facts rise to the level of extraordinary, exceptional, and rare.

We do not suggest that any one fact is dispositive or will always support a finding of particularly cruel, heinous, or depraved conduct to satisfy extraordinary aggravating factor one. Instead, we trust that trial courts will carefully consider all the facts to determine whether extraordinary aggravating factor one has been met, in light of the Legislature's intent to "increas[e] the use of compassionate release." Ibid.

### B.

Because the trial court's finding on extraordinary aggravating factor one was sufficient to deny compassionate release, we do not reach the other extraordinary aggravating factors relied upon by the court or discussed by the parties. We likewise do not reach the State's alternative grounds for reversal.

### C.

We agree with Celestine and the ACLU that if a trial court considers extraordinary aggravating factors raised by the State in opposing compassionate release, it must also consider significant mitigating factors raised by an inmate that point in favor of release. Yet we decline to remand because the trial court did consider mitigating evidence here.

23

We had no occasion to consider mitigating factors in A.M. But in other areas of the law, our courts do not consider aggravating factors without also considering mitigating factors. At sentencing, "[m]itigating factors that are called to the court's attention should not be ignored," and any that are "supported by credible evidence" "must be found." State v. Case, 220 N.J. 49, 64 (2014) (internal quotations omitted). Similarly, before the Legislature abolished the death penalty, courts reviewing the proportionality of a death sentence evaluated both aggravating and mitigating factors. See, e.g., State v. Bey, 137 N.J. 334, 350 (1994).

The mitigating factors the Legislature has set forth for courts to consider at sentencing, N.J.S.A. 2C:44-1(b)(1) to (14), may not be relevant at a compassionate release hearing years later. But other mitigating evidence may weigh strongly in favor of compassionate release, such as a petitioner's conduct in prison, including lack of disciplinary infractions and involvement in work, courses, or other activities; testimony from those who know the person well about their extraordinary adjustment to prison life or personal transformation; strong family or community support; and more.

The trial court considered such evidence here. Recall that the trial court quoted testimony from Dr. Braimbridge and Dr. Cassidy that Celestine was a "respectful" and "delightful human being," whose behavior at Edna Mahan

24

was "exemplary" and who was "loved by her peers." The court catalogued the many courses Celestine took while incarcerated and her long work history. It acknowledged her activities with the prison church. It recognized that Celestine had zero infractions during her decades-long incarceration. It documented how Celestine "expressed remorse for all of her crimes," and "insist[ed] that she profoundly regretted what she had done." It described Celestine's strong support from her children and grandchildren, and it found that Celestine's daughter "would take good and loving care of her." Yet it still denied compassionate release, implicitly finding none of that could overcome Celestine's extraordinarily cruel, heinous, and depraved conduct. We discern no abuse of discretion in that conclusion.

In summary, in petitioning a court for compassionate release, the inmate bears the burden of proving she meets the Act's medical and public safety requirements. If the State relies on one or more extraordinary aggravating factors to then oppose compassionate release, petitioners can present significant mitigating factors that point in favor of release, which the trial court must consider. The existence of mitigating factors alone, however, cannot establish that an individual is entitled to compassionate release.

25

## V.

The judgment of the Appellate Division is therefore reversed, and the order of the trial court denying compassionate release is reinstated.


CHIEF JUSTICE RABNER and JUSTICES PATTERSON, PIERRE-LOUIS, FASCIALE, and NORIEGA join in JUSTICE WAINER APTER's opinion.

26